UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| JAMES S.[1], | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL NO.  4:20cv34 |
| | ) | |
| ANDREW SAUL, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

OPINION AND ORDER

This matter is before the court for judicial review of a final decision of the defendant Commissioner of Social Security Administration denying Plaintiff's application for  Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) as provided for in the Social Security Act. 42 U.S.C. § 423(a), § 1382c(a)(3).  Section 405(g) of the Act provides, inter alia, "[a]s part of his answer, the [Commissioner] shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based.  The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the case for a rehearing."  It also provides, "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  42 U.S.C. §405(g).

The law provides that an applicant for disability insurance benefits must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months. . . ."  42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A).  A physical or mental

---

[1]  To protect privacy, Plaintiff's full name will not be used in this Order.

impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §423(d)(3). It is not enough for a plaintiff to establish that an impairment exists. It must be shown that the impairment is severe enough to preclude the plaintiff from engaging in substantial gainful activity. *Gotshaw v. Ribicoff*, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372 U.S. 945 (1963); *Garcia v. Califano*, 463 F.Supp. 1098 (N.D.Ill. 1979). It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff. *See Jeralds v. Richardson*, 445 F.2d 36 (7th Cir. 1971); *Kutchman v. Cohen*, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings. *Scott v. Astrue*, 734, 739 (7th Cir. 2011); 42 U.S.C. §405(g). "Substantial evidence is defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984) quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); *see also Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010). "If the record contains such support [it] must [be] affirmed, 42 U.S.C. §405(g), unless there has been an error of law." *Garfield*, *supra* at 607; *see also Schnoll v. Harris*, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after consideration of the entire record, the Administrative Law Judge ("ALJ") made the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2019.

2.      The claimant has not engaged in substantial gainful activity since May 27, 2016, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*)

3.      The claimant has the following severe impairments: degenerative disc disease; obesity; attention deficit hyperactivity disorder (ADHD); anxiety; and depression (20 CFR 404.1520(c) and 416.920(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant can lift and carry twenty pounds occasionally and ten pounds frequently.  The claimant can sit for six hours and stand and/or walk for six hours for a total of eight hours in a workday, with normal breaks.  The claimant can never reach overhead with both upper extremities, but can frequently reach in all other directions with both upper extremities and frequently handle and finger with both hands.  The claimant can occasionally climb ramps and stairs, as well as occasionally balance, stoop, kneel, and crouch.  The claimant can never climb ladders, ropes, or scaffolds, never crawl, never work at unprotected heights, and never work around dangerous machinery with moving mechanical parts.  The claimant is limited to simple work-related decisions and simple, routine tasks with no assembly line work or strictly enforced daily production quotas.  The claimant is limited [to] occasional interaction with the general public, co-workers, and supervisors.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.      The claimant was born on May 18, 1966 and was 49 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from May 17, 2016, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 21-30).

Based upon these findings, the ALJ determined that Plaintiff was not entitled to disability benefits. The ALJ's decision became the final agency decision when the Appeals Council denied review. This appeal followed.

Plaintiff filed his opening brief on January 18, 2021. On March 30, 2021, the defendant filed a memorandum in support of the Commissioner's decision, to which Plaintiff replied on April 12, 2021. Upon full review of the record in this cause, this court is of the view that the ALJ's decision must be remanded.

A five-step test has been established to determine whether a claimant is disabled. *See Singleton v. Bowen*, 841 F.2d 710, 711 (7th Cir. 1988); *Bowen v. Yuckert*, 107 S.Ct. 2287, 2290-91 (1987). The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment "severe"? (3) Does the impairment meet or exceed one of a list of specific impairments? (4) Is the claimant unable to perform his or her former occupation? (5) Is the claimant unable to perform any other work within the economy? An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled.

4

*Nelson v. Bowen*, 855 F.2d 503, 504 n.2 (7th Cir. 1988); *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985); accord *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984).  From the nature of the ALJ's decision to deny benefits, it is clear that step five was the determinative inquiry.

On January 9, 2015, Plaintiff saw Richard B. Rodgers, M.D., at Goodman Campbell Brain and Spine, for balance issues and chronic back pain that radiated to the extremities, causing numbness and tingling. (Tr. 328-29.) Dr. Rodgers reviewed a total spine MRI, which showed mild degenerative changes with congenital stenosis in the lumbar spine, disc osteophyte-related changes in the mid-to lower-thoracic spine, causing some anterior cord compression, and degenerative disc changes in the cervical spine, most prominent at C5-6 and C6-7, with a disc herniation, thickening, or ossification that caused significant spinal cord compression. (*Id.*) Dr. Rodgers diagnosed mild myelopathy likely due to spinal cord compression and discussed surgical options. (*Id.*)

On February 26, 2015, Plaintiff underwent a corpectomy at C6 with application of an intervertebral synthetic cage; the post-operative diagnosis was cervical spondylotic myelopathy with herniated intervertebral disc. (Tr. 330-32.) Plaintiff returned to Dr. Rodgers on April 1, 2015; his "arm symptoms [were] markedly resolved," but he still had a lot of interscapular neck and back pain. (Tr. 333.) A same-day x-ray of the cervical spine was unremarkable status post C6 corpectomy. (Tr. 334.) At a follow-up on June 3, 2015, Plaintiff's neck pain was improving but he had some headaches, his back pain was a "significant problem," and he continued to have balance issues. (Tr. 335.) A same-day x-ray showed no changes. (Tr. 336.) Dr. Rodgers advised that thoracic disc surgery was not ideal at that time. (Tr. 335.)

A July 29, 2016 cervical spine MRI showed degenerative changes throughout, most pronounced at C3-C4, with disc bulging/extrusion causing mild mass effect on the spinal cord and

questionable increased signal within the cord which could reflect edema or myelomalacia. (Id.)

On August 17, 2016, Plaintiff began treatment with Charles Turner, M.D., at Innovative Medicine, for neck and back pain, loss of muscle mass and numbness in the right hand, tingling in the collar bone, difficulty sleeping, and fatigue. (Tr. 432-34.) Exam revealed decreased spinal flexion and a guarded attitude. (Tr. 434.) At an appointment on August 31 2016, Dr. Turner diagnosed chronic pain that kept Plaintiff awake at night,  insomnia, and anxiety. (Tr. 430-31.) In September and October 2016 Plaintiff continued to have "constant pain" in his neck and his medications were adjusted. (Tr. 428-30.) On November 23, 2016 Plaintiff reported increased pain; fatigue was added to his diagnoses and he was prescribed Xanax. (Tr. 426-27.) On February 15, 2017, it was noted that Norco and Percocet had helped Plaintiff's symptoms, but he had failed various narcotics and other medications, back braces, injections, chiropractic intervention, inversion table, physical therapy, and Flexeril. (Tr. 422-23.) On March 15 2017, Plaintiff reported sharp pain and numbness in the left shoulder and swelling in the right shoulder. (Tr. 421-22.) In April and May 2017, Plaintiff reported increased pain and increased anxiety and insomnia; he was waiting for a referral to a psychiatrist. (Tr. 419-20.) In July 2017, Plaintiff had a flat affect, was "obviously in pain," his spine was tender from the neck to lower back, flexion and extension were slow, and he had an "obviously restricted" gait. (Tr. 417.) On August 2, 2017 Plaintiff's pain had improved, but not alleviated; Dr. Turner discussed cortisone injections and added a diagnosis of paresthesias of the right hand (referred him to a neurologist). (Tr. 415-16.)

On June 8, 2017, Plaintiff underwent an initial psychiatric assessment performed by Aldo Buonanno, M.D., at Alpine Clinic, LLC. (Tr. 363-65.) Plaintiff had trouble falling and staying asleep, hallucinations, dissociation, paranoia, and trust issues. (Tr. 363.) Exam showed back pain

with decreased muscle strength, slow gait, inability to stand long, depressed and anxious mood, anger, irritability, "high strung" behavior, illogical thought processes, feeling betrayed, lack of trust, varied judgment, lack of insight, somewhat slow concentration, and shortened attention span. (Tr. 364-65.) Dr. Buonanno diagnosed generalized anxiety disorder, post-traumatic stress disorder (PTSD), and delusional disorder. (Tr. 365.) At follow-ups between July and September 2017 Plaintiff had depressed, anxious, and tearful mood and/or labile affect; he complained of poor concentration, hyperactivity, irritability, frustration, and anxiety. (Tr. 351-62.)

On September 13, 2017, Plaintiff underwent a Neuropsychological Evaluation performed by Kelly S. Earnst, Ph.D., H.S.P.P., at Alpine Clinic, LLC. (Tr. 346-50.) Plaintiff reported longstanding issues with concentration, distraction, staying on task, finishing tasks, forgetfulness, procrastination, depression, frustration, agitation, feelings of worthlessness, low energy, and excessive worry. (Tr. 346.) During exam, Plaintiff got off topic and seemed distracted at times; he required frequent clarification of test questions and instructions. (Tr. 347.) Testing indicated overall intellectual abilities in the borderline range, with a full-scale IQ of 77 and problems with sustained attention, delayed recall, and mental flexibility. (Tr. 347-49.) Dr. Earnst diagnosed attention-deficit/hyperactivity disorder (ADHD), major depressive, and generalized anxiety disorders; she noted that Plaintiff's mood symptoms likely "had a negative effect on his concentration and thinking". (Tr. 349.)

On February 21, 2018, at the request of the State Agency, Plaintiff underwent a consultative examination performed by Luella Bangura, M.D. (Tr. 370-73.) Plaintiff reported right hand weakness, lower back pain that radiates to his arms and legs, inability to pick up items or reach overhead, difficulty walking, standing, sitting, and moving his head side to side and up and

down, headaches, trouble focusing, difficulty leaving the house and being in crowds, and panic

attacks; Plaintiff was seeing mental health professionals, but lost his insurance. (Tr. 370.) On

exam, Plaintiff had difficulty turning his head side to side and tenderness in the cervical spine; he

had decreased reflexes in the right leg, could walk on heels with some difficulty, bend 50% of the

way, and could not squat. (Tr. 371-72.) Dr. Bangura diagnosed right hand weakness, anxiety,

ADHD, and morbid obesity. (Tr. 372.)

Plaintiff returned to Dr. Turner on February 22, 2018; on exam, he was squirming in his

chair, seemed to be uncomfortable, and had numbness and tingling in the wrist and fingers of the

right hand as well as atrophy. (Tr. 402-04.) Dr. Turner adjusted Plaintiff's medications and

referred him to a neurologist for arm paresthesia.  Dr. Turner also noted that Plaintiff had failed

multiple medications to alleviate his insomnia and was "out of most options" for treatment, was

unable to afford testosterone, which would likely help his energy and pain, and had not taken

Xanax since November 2017 when he was last seen at Alpine Clinic. (*Id*.) On March 22, 2018 Dr.

Turner diagnosed attention deficit disorder (ADD), without hyperactivity and prescribed Adderall.

(Tr. 411-13.)

On March 6, 2018, due to an insurance change, Plaintiff began treatment with a new

mental health provider, Wabash Valley Alliance, where he saw Nathan Worster, L.M.H.C., M.A.,

Q.B,H.P. (Tr. 375-83.) Plaintiff reported difficulties with concentration and reading, multiple past

arrests for fighting, and chronic pain in his neck and back. (Tr. 375-76.) Mental status exam

revealed only fair judgment and poor to fair concentration; his Global Assessment of Functioning

(GAF) score was 55 (moderate symptoms). (Tr. 380-83.) The diagnosis was ADHD, combined

type. (Tr. 380.) On April 2, 2018 Plaintiff was evaluated by Zeinab Tobaa, M.D., Wabash Valley

Alliance. (Tr. 388-94.) Exam showed reluctance to reveal information, non-cooperative behavior, guarding, defensiveness, dysphoric mood, and frustration; he had "fair" short- and long-term memory, low-average intellect, and "questionable" judgment and insight. (Tr. 390-91.) Dr. Tobaa diagnosed mood disorder, unspecified, and prescribed Lamictal (mood stabilizer). (Tr. 391.)

Plaintiff returned for monthly appointments with Dr. Turner between April 2018 to January 2019. (Tr. 405-10, 435-53.) He had continued numbness and tingling in the wrist and fingers of the right hand with muscle atrophy, pain, insurance problems and difficulty finding a mental health provider, and worsening insomnia. (*Id*.)

In February 2018, a medical consultant opined Plaintiff could perform light work. (Tr. 63-88.) A psychological consultant opined that, despite his severe ADHD and trauma/stress-related disorders, Plaintiff could perform simple, unskilled work routines in jobs without fast pace, quotas, or more than superficial interaction with the public. (*Id*.) These opinions were affirmed. (Tr. 91-120.)

Plaintiff completed Function Reports in January and July 2018. (Tr. 260-76, 288-94.) Plaintiff's partner completed a Third-Party Function Report in July 2018. (Tr. 295-302.)

At the hearing before the ALJ Plaintiff testified that before his surgery in 2014, he worked in maintenance, lifting up to 125 pounds and being on his feet all day long. (Tr. 45.) He cannot work now because he cannot be on his feet for more than 20 to 25 minutes, even with his cane; without his cane, he leans against the wall, his legs lock, and he becomes dizzy if he stands long. (Tr. 47.) He has been using the cane, which Dr. Turner recommended, for the past three years. (Tr. 47-48.) His neck pain has worsened since his surgery and he has poor range of motion and stiffness. (Tr. 49.) His hands, fingers, elbows, and left leg have constant numbness and tingling; he

is unsure if insurance would cover cortisone injections. (Tr. 49-50, 53.) He has difficulty buttoning his pants and writing; he does dishes sitting down and cannot carry a laundry basket because he has balance issues. (Tr. 50.) When he stands, he gets dizzy and must hold on to something for a few minutes; sometimes he has numbness and tingling in his feet when he stands. (Tr. 50-51.) He needs help dressing because he cannot lift his arms above his head, button his shirt, or tie his shoes. (Tr. 51.) He spends most of the day on the couch because it is the only comfortable position. Plaintiff only sleeps 5 hours at night and naps every day. (Tr. 52-53.) Once or twice a week, Plaintiff does not get out of bed due to back pain. (Tr. 53.) He has issues with memory and concentration and loses personal items "constantly." (Tr. 53-54.) He uses an electric cart when grocery shopping and does not shop alone; he cannot load and unload groceries because he cannot stand without a cane. (Tr. 54.)

The Vocational Expert (VE) testified in response to a hypothetical question consistent with the ultimate residual functional capacity (RFC). (Tr. 57-60.) She testified that the individual could work as: Small Parts Assembler, Dictionary of Occupational Titles (DOT) No. 706 .684-022; Electronics Worker, DOT No. 726.687-010; and, Laundry Folder, DOT No. 369.687-018. (Tr. 57-58.) Needing to alternate between sitting and standing more frequently than every 30 minutes or bilateral handling, fingering, and feeling only occasionally would eliminate work. (Tr. 58, 60.) Further, the individual could perform the occupations identified if he required a cane for ambulation, but not for balance, and could lift up to 20 pounds in the other hand. (Tr. 59.) More than one absence per month or being off task more than 10 percent would preclude employment. (*Id.*)

In support of remand, Plaintiff first argues that it was improper for the ALJ to rely on the

opinions submitted by the State Agency consultants who reviewed the record in 2018.  Plaintiff

contends that the State Agency medical consultants' opinions were based on select findings from a

single exam. (Tr. 100.) Plaintiff claims that the Agency consultants did not consider exams

showing decreased spinal flexion (Tr. 434), back pain with decreased muscle strength, slow gait,

and inability to stand long (Tr. 364-65), obvious pain, tenderness from the neck to the lower back,

slow flexion and extension, obviously restricted gait (Tr. 417); objective testing showing

abnormalities; diagnoses of myelopathy (Tr. 328-29), cervical spondylotic myelopathy with

herniated intervertebral disc (Tr. 330-32), chronic pain (Tr. 430-31), right hand paresthesia (Tr.

415-16); corpectomy and cage application surgery (Tr. 330-32);  complaints of pain, balance

issues, difficulty engaging in certain activities, and fatigue/insomnia (Tr. 328-29, 335, 363, 428,

421-22); and heavy medications, including Percocet, Trazodone, and Norco, which were

frequently adjusted (Tr. 365, 422-23, 430-31). Plaintiff contends that the single exam cited by the

Agency medical consultants does not support their assessment of Plaintiff's capabilities.

Plaintiff further contends that the State Agency opinions (rendered in February and July

2018) are critically outdated given the new evidence they did not assess, including continued

numbness, tingling, and atrophy of the muscles of the right hand (Tr. 402-07), failed treatments for

insomnia (Tr. 402-04, 440), exam showing only fair judgment, poor to fair concentration, and a

GAF score of 55 (Tr. 380-83), exam showing reluctance to reveal information, non-cooperative

behavior, guarding and defensiveness, only "fair" short- and long-term memory, low-average

intellect, and "questionable" judgment and insight (Tr. 390-91), and a new diagnosis of mood

disorder (Tr. 391).

Also, Plaintiff argues that the ALJ ultimately found the State Agency consultants' opinions

"persuasive," even though he assigned additional restrictions based on evidence that the consultants did not have available to them. (Tr. 27-28.) Thus, Plaintiff concludes that the ALJ's own recognition that the Agency consultants' opinions were outdated and incomplete shows that the ALJ impermissibly relied on his own layperson's opinion in crafting the RFC. *Jonie G. v. Saul*, No. 18 CV 50100, 2019 WL 6716610, at *6 (N.D. Ill. Dec. 10, 2019) (ALJ errors couldn't be salvaged by State Agency consultants' opinions because they were outdated, inconsistent with other evidence in the record, and ALJ did not rely on them); *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) (ALJs "must not succumb to the temptation to play doctor and make their own medical findings"); *Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003) (ALJs may not substitute their own opinions to fill gaps in the record).

In response, the Commissioner argues that the Agency consultants did not rely on only a single exam but reviewed treatment notes from throughout the period at issue. The Commissioner further asserts that the ALJ was entitled to rely on the opinions because the Agency consultants are "highly qualified and experts in Social Security disability evaluation", and, in any event, it was the ALJ's responsibility to determine Plaintiff's RFC. Clearly, the fact that the Agency consultants may be "highly qualified" does not automatically render the opinions supported. *Giacchetti v. Berryhill*, No 16 C 5055, 2017 WL 1731715, at *7 (N.D. Ill. May 2, 2017) ("While evidence from agency medical consultants is relevant because they are 'highly qualified and experts in Social Security disability evaluation, expertise in Social Security evaluation is not what makes the opinion of a [medical source] probative.").

This Court agrees with Plaintiff that the opinions are not supported in light of the medical consultants' apparent failure to consider exams showing a multitude of abnormal findings as set

forth above.

Although it is the ALJ's duty to craft the RFC, the ALJ is still "required to rely on expert opinions instead of determining the significance of particular medical findings himself." *Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014); *Wesolowski v. Colvin*, No. 15 C 8830, 2016 WL 6082353, at *3 (N.D. Ill. Oct. 18, 2016) (if an ALJ discounts the opinions of medical experts, including State Agency consultants, "the ALJ [is] obligated to seek out additional expert assistance" and not make his own medical determinations). Here, as noted above, in addition to the evidence that State Agency consultants failed to consider, there was new evidence post-dating their review, including continued numbness, tingling, and atrophy of the right hand muscles, failed treatments for insomnia, an exam showing only fair judgment, poor to fair concentration, and a GAF score of 55, an exam showing reluctance to reveal information, non-cooperative behavior, guarding and defensiveness, only fair short- and long-term memory, low-average intellect, and "questionable" judgment and insight, and a new diagnosis of mood disorder. Clearly, these findings "bear[] directly" on, and undermine, the State Agency's opinions. *Moreno v. Berryhill*, 882 F.3d 722, 729 (7th Cir. 2018). In light of the amount of evidence that does not appear to have been reviewed, this Court will, out of an abundance of caution, remand on this issue.

Next, Plaintiff argues that the ALJ erred at Step Three. Step Three requires consideration of whether a claimant's conditions, individually or in combination, meet or equal a listed impairment. *See* 20 C.F.R. §§ 404.1520, 404.1525, 404.1526. Plaintiff contends that, here, the Step Three analysis is flawed because the ALJ failed to properly consider medical equivalence given the combination of Plaintiff's conditions.

In assessing medical equivalence, the ALJ must look at the signs, symptoms, and

13

laboratory findings of all impairments to determine if they medically equal a Listing. Plaintiff

contends that the ALJ failed to analyze all of the critical evidence when he concluded that there

was no medical equivalence and that although Plaintiff's individual impairments may not meet a

listing on their own, there are "closely analogous" listings that the combination of impairments

could medically equal. *See Clark v. Astrue*, No. 2:11–CV–300–PRC, 2013 WL 1213141, at *11

(N.D. Ind. Mar. 22, 2013)(remanding and directing ALJ to consider whether the cumulative effect

of claimant's impairments medically equaled any listed impairment).

      Plaintiff's neck and back pain are evaluated under Listing 1.04(A). The record shows that

Plaintiff has several, but not all, of the abnormal signs, symptoms, and laboratory findings therein:

> Listing 1.04 — Disorders of the Spine (e.g., herniated nucleus pulposus, spinal
> stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture),
> resulting in compromise of a nerve root (including the cauda equina) or the spinal
> cord. With (A) nerve root compression characterized by neuro-anatomic
> distribution of pain, limitation of motion of the spine, motor loss accompanied by
> sensory or reflect loss, and, if there is involvement of the lower back, positive
> straight-leg raising test sitting and supine . . . .

20 C.F.R. Pt. 404, Subpt. P., App. 1, § 1.04. Plaintiff has multiple disorders of the spine (*i.e.*,

congenital stenosis in the lumbar spine and cervical spondylotic myelopathy) (Tr. 328-32),

established by diagnostic testing, which showed, in 2015, anterior cord compression in the mid- to

lower-thoracic spine, and degenerative disc changes in the cervical spine with disc herniation,

thickening, or ossification causing significant spinal cord compression (Tr. 328-29) and evidence

of a herniated, status post corpectomy disc (Tr. 330-32). In 2016, testing showed degenerative

changes throughout the cervical spine, most pronounced at C3-C4, with disc bulging/extrusion

causing mild mass effect on the spinal cord and questionable increased signal within the cord

which could reflect edema or myelomalacia (Tr. 337-38).  Plaintiff notes that the record also

14

shows neuroanatomical distribution of pain.  Plaintiff has complained of neck and back pain post-surgery, including radiating pain, numbness, tingling, and loss of muscle mass in the right hand, and inability to pick up items or reach overhead. (Tr. 328-29, 370, 432-34.) Exams showed decreased muscle strength (Tr. 364-65), slow flexion and extension (Tr. 417), decreased reflexes in the leg (Tr. 371-72), and reduced range of motion in the neck (*id*.).

Plaintiff acknowledges that he may not meet Listing 1.04 because each of the aforementioned signs cannot be attributed solely to Plaintiff's lumbar or cervical issues. Rather, Plaintiff demonstrates each of the criteria only if his back and neck problems are considered in combination. As there are other relevant findings, Plaintiff contends that requires careful consideration of medical equivalence because there is other evidence that could be of equivalent significance to the abnormality not documented in Listing 1.04. *See* 20 C.F.R. § 404.1526. For example, Plaintiff's exams have shown tenderness from the neck to the back. (Tr. 364-65, 371-72.) Plaintiff has been prescribed narcotics (Percocet, Norco), which do not eliminate Plaintiff's back pain. (Tr. 422-23.) Plaintiff has failed other treatments for his back and neck pain, including back braces, injections, chiropractic intervention, inversion therapy, physical therapy, and muscle relaxers. (*Id*.) He also has demonstrated abnormal gait during exams (Tr. 364-65, 417), has been using a cane for years due to balance issues (Tr. 54, 294), and uses an electric chair at the grocery store (Tr. 54).

Plaintiff further notes that during the February 2018 consultative exam, he could not squat or properly bend at the waist and had difficulty walking on heels. (Tr. 371-72.) Plaintiff cannot stand more than 20 to 25 minutes even with his cane (Tr. 47) or sit or lie down more than 15 to 20 minutes before needing to change positions (Tr. 262-64, 289, 294); can only consistently lift 10

pounds and cannot carry a laundry basket due to balance issues (Tr. 48-50), has difficulty with buttons (Tr. 50, 263, 289), and cannot squat or bend properly (Tr. 269-73, 292). Also, Plaintiff is obese—a condition the ALJ found severe. (Tr. 21.)

Plaintiff argues that all of this evidence, which he claims the ALJ did not analyze, shows that Plaintiff's combined back and neck issues and obesity, are of at least equal medical significance to Listing 1.04 such that he could medically equal that listing. *See Garner v. Berryhill*, No. 1:18cv211, 2019 WL 1324605, at \*7 (N.D. Ind. Mar. 22, 2019); *Parker v. Astrue*, 597 F.3d 920, 923 (7th Cir. 2010) ("[ALJ's] failure to consider the cumulative effect of impairments not totally disabling in themselves was an elementary error.").

In response, the Commissioner argues that the ALJ "minimally articulate[d]" his reasons for his conclusions throughout the Decision. However, the inquiry is not whether the ALJ addressed every piece of evidence, but whether a logical bridge exists from the evidence to the ALJ's conclusions. *E.g., Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015). In the present case, the ALJ failed to consider critical evidence and, accordingly, did not build a logical bridge to his conclusions. The ALJ's analysis of Listing 1.04 did not consider:  diagnoses of numerous disorders of the spine (*i.e.*, congenital stenosis of the lumbar spine and cervical spondylotic myelopathy);  objective testing showing significant spinal cord compression, degenerative disc changes, disc bulging/extrusion, and possible increased signal in the spinal cord reflecting edema or myelomalacia; Plaintiff's complaints of radiating pain, numbness, tingling, loss of muscle mass in the right hand, and inability to pick up items or reach overhead despite undergoing surgery; exams showing decreased muscle strength, abnormal range of motion, and decreased reflexes in the legs and reduced range of motion in the neck; and

evidence of abnormal gait, pain not alleviated by medications or various treatments, use of a cane and electric chair, and difficulty walking, standing, sitting, bending, squatting, carrying items, and reaching.  It is clear that the ALJ failed to make a "meaningful attempt to analyze the evidence." *See V. J. H. v. Colvin*, No. 1:15-cv-00073-TAB-WTL, 2016 WL 760952, at \*3 (S.D. Ind. Feb. 23, 2016).

The Commissioner also argues that Plaintiff cannot show medical equivalence through the combination of his conditions.  However, Agency regulations specifically state that if no individual impairment meets a listing, the combination of impairments will be considered under a closely analogous listing. 20 C.F.R. § 404.1526(b)(3) (citing 20 C.F.R. § 404.1525(c)(3)). This Court has found that musculoskeletal impairments, considered in combination, could equal a Listing under Listing 1.00. *See, e.g., Roberta F. v. Saul*, No. 1:20cv63, 2021 WL 321447, at \*8 (N.D. Ind. Feb. 1, 2021) (recognizing that claimant's knee osteoarthritis under Listing 1.02, when considered in combination with her lumbar spine issues, could equal Listing 1.04 and remanding for expert determination as to whether claimant's conditions medically equaled a listing).

The Commissioner points out that the State Agency consultants found that Plaintiff's conditions did not meet or equal Listing 1.04. However, the ALJ did not rely on those opinions, or on any other medical opinion, in assessing medical equivalence at Step Three. *See Davis v. Berryhill,* No. 4:16-CV-196-TAB-RLY, 2017 WL 4456722, at \*2 (S.D. Ind. Oct. 6, 2017) ("[T]he ALJ did not indicate that he accepted [the state agency physician's] opinion regarding medical equivalence."). The only reference the ALJ made to the State Agency opinions was in the RFC; this cannot serve as evidence at Step Three. *Jonie G. v. Saul*, No. 18 CV 50100, 2019 WL 6716610, at \*6 (N.D. Ill. Dec. 10, 2019).  In any event, the State Agency opinions were outdated

and incomplete. Thus, the ALJ improperly substituted his own opinion to fill in the gap. *Sullivan v. Colvin*, No. 1:13–cv–01758–JMS–DKL, 2014 WL 4059796, at * (S.D. Ind. Aug. 14, 2014) ("[W]hen an ALJ relies on an incomplete medical expert opinion and interprets additional medical records on his own, the ALJ improperly crosses the line between judge and medical doctor.").

The Commissioner cites *Filus v. Astrue*, 694 F.3d 863, 867 (7th Cir. 2012), for his position that "[b]ecause no other physician contradicted [the State Agency] opinions, the ALJ did not err in accepting them." However, as previously noted, the State Agency consultants did not consider all the evidence and, thus, did not consider the combination of all of Plaintiff's conditions. Further, the State Agency consultants did not even mention the significant abnormalities in Plaintiff's spine as shown by numerous x-rays, MRIs, and exams, let alone discuss the significance of these findings, which undermine the consultants' conclusions. Thus, the ALJ was not entitled to rely on their opinions. *See, e.g., Stage*, 812 F.3d at 1126 ("Before basing a denial on [outdated State Agency opinions], the ALJ should have considered contrary evidence and obtained a medical opinion based on a complete record."). Thus, remand is required on the medical equivalency analysis.

Next, Plaintiff argues that the RFC is not supported and lacks an accurate and logical bridge. The RFC is a determination of the most a claimant can do. Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *1 (July 2, 1996). It is based upon consideration of "all relevant evidence in the case record." *Id*. at *5. Plaintiff contends that because of the errors discussed above, the RFC is unsupported. Plaintiff further contends that the RFC fails because it does not accommodate Plaintiff's conditions and the ALJ erred in assessing Plaintiff's and a third-party's statements.

Plaintiff argues that the RFC fails to properly accommodate Plaintiff's limitations, and notes that merely "summarizing a medical history is not the same thing as analyzing it, in order to build a logical bridge from evidence to conclusion." *Chuk v. Colvin*, No. 14 C 2525, 2015 WL 6687557, at *7 (N.D. Ill. Oct. 30, 2015). Likewise, an ALJ may not selectively consider medical reports, but must consider "all relevant evidence." *See Clifford v. Apfel*, 227 F.3d 863, 871 (7th Cir. 2000). Even non-severe conditions must be included in the RFC. 20 C.F.R. § 404.1545(a)(1) (we will assess your residual functional capacity based on all the relevant evidence in your case record); 20 C.F.R. § 404.1545(a)(2) (we will factor non-severe impairments into the RFC); SSR 96-8p, 1996 WL 374184, at *5 (non-severe impairments may be critical to the RFC determination when considered in combination with other impairments)

Plaintiff contends that the ALJ erred in failing to determine the precise duration Plaintiff is able to sit and stand at one time before needing to change positions and to include a sit/stand option in the RFC to accommodate Plaintiff's conditions. *See* SSR 96-9p, 1996 WL 374185, at *7 (July 2, 1996) ("The RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing."). Plaintiff points out that the precise length of time he can sit and stand is critical in this case given the VE's testimony that needing to alternate positions more frequently than every 30 minutes would preclude work. (Tr. 58.)

Plaintiff further asserts that, given the evidence of Plaintiff's neck and back conditions and obesity, there is no accurate and logical bridge with respect to the ALJ's restrictions to sitting up to 6 out of 8 hours per day, standing or walking up to 6 out of 8 hours per day, lifting and carrying 20 pounds occasionally and 10 pounds frequently, occasional climbing of ramps and stairs, and occasional balancing, stooping, kneeling, crouching, and crawling. *E.g.*, Tr. 48-50, 263, 52, 54,

269-73, 292, 300, 370-72. *See Adams v. Berryhill*, No. 1:18-CV-291-PPS, 2019 WL 2591016, at

*3-4 (N.D. Ind. June 24, 2019). Additionally Plaintiff asserts that, given the numbness, tingling,

and muscle loss in Plaintiff's right hand and inability to lift his arms overhead, there is no bridge to

the ALJ's restriction to frequent handling and fingering. (Tr. 50-51, 328, 370, 415-16, 432).

*Christine F. v. Saul*, No. 2:19-cv-359, 2020 WL 1673033, at *7 (N.D. Ind. Apr. 6, 2020) (given

claimant's hand numbness and tingling, ALJ's failure to consider manipulative restrictions was not

harmless where claimant would have been unable to perform her past work if restricted to less

than frequent handling and fingering).

Plaintiff next asserts that the ALJ did not adequately address whether Plaintiff would be

absent from work or need to be off task, despite ample evidence that restrictions in these areas are

necessary due to Plaintiff's borderline intellectual abilities (Tr. 347-49); major depressive disorder,

generalized anxiety disorder, and ADD/ADHD (Tr. 265-66, 346, 349); fatigue and insomnia, (Tr.

52-53, 363, 402-04, 430-3); and pain (Tr. 263 430-31). Even the State Agency consultants, whose

opinions the ALJ found persuasive, opined that Plaintiff has moderate difficulties in his ability to

complete a normal workday and workweek without interruptions from psychologically based

symptoms and perform at a consistent pace without an unreasonable number and length of rest

periods (Tr. 116). Plaintiff suggests that this case is akin to a recent Seventh Circuit case in which,

> the Commissioner argue[d] that Lothridge failed to identify which additional
> limitations were supported by the record. As the vocational expert testified,
> however, for Lothridge to be employable, she would need to be able to stay on task
> for at least 90% of the workday and to have minimal tardiness and only one
> absence per month. The ALJ neither cited evidence that Lothridge could meet these
> benchmarks nor addressed the evidence that she could not. *See Winsted v.*
> *Berryhill*, 923 F.3d 472, 477 (7th Cir. 2019). The Commissioner proposes that the
> ALJ implicitly rejected that evidence by imposing no limitations beyond restricting
> Lothridge to simple tasks and decisions. But this attempt to supply a post-hoc

> rationale for the ALJ's decisive findings runs contrary to the *Chenery* doctrine. See
> *SEC v. Chenery Corp.*, 318 U.S. 80, 87–88, 63 S.Ct. 454, 87 L.Ed. 626 (1943);
> Parker, 597 F.3d at 922. The record also contains evidence of additional
> limitations—such as a need for frequent breaks and accommodations for poor
> concentration and focus—that the ALJ was obliged to consider. *See Young v.
> Barnhart,* 362 F.3d 995, 1002–03 (7th Cir. 2004).

*Lothridge v. Saul*, --- F.3d ---, 2021 WL 37503, at *6 (Jan. 5, 2021). Here, the VE testified that

more than one absence per month or being off task more than 10 percent of the workday would

preclude employment. (Tr. 59.) Yet, like in *Lothridge*, the ALJ in this case did not assess whether

Plaintiff could meet these benchmarks, nor address the evidence suggesting that he cannot.

Plaintiff also contends that the ALJ erred in assessing Plaintiff's and third-party's

statements. Plaintiff argues that the ALJ failed to properly analyze and discuss the abnormal

findings, which support Plaintiff's statements. Plaintiff further argues that the ALJ improperly

rejected other evidence corroborating Plaintiff's symptoms.

Plaintiff next contends that the ALJ also erred in finding the statements of Plaintiff's

partner "unpersuasive." (Tr. 28.) Clearly, a family member need not be medically trained to render

an opinion. *See Teschner v. Colvin*, No. 15 C 6634, 2016 WL 7104280, at *9 (N.D. Ill. Dec. 6,

2016) (regulations permit testimony from family members without requiring them to have medical

training). Also, the Seventh Circuit has cautioned against reducing the weight of familial

third-party reports merely because the possibility for bias exists. *See, e.g., Garcia v. Colvin*, 741

F.3d 758, 761 (7th Cir. 2013); *see also, Smolen v. Chater,* 80 F.3d 1273, 1289 (9th Cir. 1996)

(testimony from family members is of "particular value") (citation omitted). Plaintiff claims that his

partner's statements largely corroborate Plaintiff's statements and are consistent with observations

by medical professionals.; *see also Brinley v. Berryhill*, 732 F. App'x 461, 466 (7th Cir. 2018)

(fact that family member report echoed many of plaintiff's own reports "is a reason to find that [plaintiff's] account was corroborated by a family member").

In response, the Commissioner argues that the medical evidence does not support Plaintiff's assertions, and that while it is clear that Plaintiff has demonstrated that he has limitations, there is no evidence that these limitations would preclude all work. The Commissioner claims that the ALJ explained his decision in such a way that this Court can determine that the Decision was logically based on the findings and evidence in the record. This Court has pondered the Decision and the evidence at some length and has many concerns about whether the RFC properly sets forth Plaintiff's limitations. There is ample evidence that Plaintiff has significant problems in many areas and its hard to fathom that he would be able to do any of the jobs identified by the VE and accepted by the ALJ. Thus remand is required on the issues related to the RFC assessment.

The Commissioner's reliance on *Burmester v. Berryhill*, 920 F.3d 507, 511-12 (7th Cir. 2019) to suggest that the RFC adequately accounts for Plaintiff's deficits in concentration, persistence, or pace and interacting with others is misplaced. In *Burmester*, the Seventh Circuit noted that the record did not document the inability to concentrate. *Id*. By contrast, in this case, there is ample evidence of Plaintiff's difficulties with concentration. And, even if the ALJ relied on the State Agency consultants' narrative explanation that Plaintiff could do "simple, unskilled work routines in jobs without a fast pace, quotas, or more than superficial interaction with the public" , the ALJ still "must adequately account for limitations identified elsewhere in the record, including specific questions raised in check-box sections of standardized forms such as the PRT and MRFC forms [*i.e.*, the "check box" RFC findings]." *DeCamp v. Berryhill*, 916 F.3d 671, 675-76 (7th Cir.

2019); *see also Yurt v. Colvin*, 758 F.3d 850, 859 (7th Cir. 2014) (reversing where ALJ failed to account for limitations identified by doctor in check-box section of forms). Like *DeCamp*, here, the ALJ's restrictions are insufficient in light of the State Agency's finding that Plaintiff has moderate limitations in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. Thus, remand is warranted.

Next, Plaintiff argues that the ALJ erred in his Step Five analysis. Plaintiff maintains that in light of the ALJ's failure to properly consider all the evidence, there is no assurance that Plaintiff can perform the occupations identified at Step Five. "[I]n this circuit, both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record." *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015). Plaintiff points out that neither the RFC nor the hypotheticals posed to the VE incorporated all of Plaintiff's limitations and, thus, the jobs identified may not reflect jobs Plaintiff can perform.

Plaintiff also asserts that with proper consideration of all the evidence, he would have been found disabled under Medical-Vocational Guidelines Rule 201.14.  Plaintiff claims that he is capable of, at most, sedentary work and given his age, education, and lack of transferrable skills, the ALJ was required to find him disabled pursuant to Rule 201.14. *See Bancolita*, 312 F. Supp. 3d at 745. On remand, the Step Five analysis should be re-evaluated.

<u>Conclusion</u>

On the basis of the foregoing, the decision of the Commissioner is hereby REVERSED AND REMANDED for further proceedings consistent with this Opinion.

Entered: April 19, 2021.

s/ William C.  Lee
William C. Lee, Judge
United States District Court
